## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| MARY BLESSENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-1262 |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER AND OPINION</u>

This matter is now before the Court on Plaintiff Mary Blessent's ("Blessent" or "Plaintiff") Motion for Summary Judgment (ECF No. 11) and Defendant Commissioner of Social Security's ("Commissioner" or "Defendant") Motion for Summary Affirmance (ECF No. 16). For the reasons stated herein, Blessent's Motion for Summary Judgment is GRANTED. The Commissioner's Motion for Summary Affirmance is DENIED. This matter is REVERSED and REMANDED to the Administrative Law Judge ("ALJ") for further proceedings consistent with this Order. This case is now TERMINATED.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the claims asserted in the Complaint present a federal question under 42 U.S.C. § 405(g). (ECF No. 1).

## PROCEDURAL HISTORY

On January 26, 2015, Blessent filed for Title II Disability Insurance Benefits, alleging disability beginning on November 19, 2014. Tr. at 13.[1] The claim was initially denied on August 25, 2015, and upon reconsideration on December 21, 2015. *Id.* On January 1, 2016, Blessent filed

---

[1] Tr. refers to the transcript page number from the record found at ECF No. 5.

a written request for a hearing before an ALJ, and her request was granted. *Id.* On May 30, 2017, Blessent and an impartial vocational expert ("VE") testified at a hearing held before ALJ Gerard J. Rickert in Peoria, Illinois. *Id.* On August 30, 2017, the ALJ issued an unfavorable decision denying her benefits. *Id.* Blessent filed a request for review on September 12, 2017, and the Appeals Council denied her request on May 11, 2018. *Id.* at 1-3. Thus, the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On July 16, 2018, Blessent filed this action (ECF No. 1) seeking judicial review pursuant to 42 U.S.C. § 405(g) and now moves for Summary Judgment. (ECF No. 11). This Opinion follows.

## FACTUAL BACKGROUND

Blessent was born on December 29, 1965. Tr. at 40. She is 5'4" and weighed 229 pounds at the time of the ALJ hearing. *Id.* She graduated from high school and obtained her Associate Degree in Criminal Justice from Heartland Community College. *Id.* at 41-42. In the past fifteen years, Blessent worked as an inserting machine operator, insurance clerk, general clerk, route delivery driver, checker, and mail clerk. *Id.* at 43. Blessent alleged she was unable to work starting on November 19, 2014, due to issues that resulted from her breast cancer and double mastectomy, specifically: neuropathy, anxiety, depression, and "chemo brain." *Id.*

### I.     Hearing Testimony

On May 30, 2017, Blessent and VE Theresa Wolford testified before ALJ Rickert. A summary of their testimony follows.

### A.     Blessent's Testimony

On the day of the hearing, Blessent was fifty-one years old and married. *Id.* at 40-41. She had no dependent children living with her, but had four cats. *Id.* at 41. Her husband drove her to the hearing. *Id.*

Blessent discovered she had breast cancer in the summer of 2014 and underwent a double mastectomy on November 19, 2014. *Id.* at 43. She has not worked since her surgery. *Id.* Blessent testified she had problems that resulted from the cancer, namely: neuropathy, anxiety, depression, and "chemo brain." *Id.* She testified that these medical issues interfered with her ability to work. *Id.* at 44.

She was prescribed hydrocodone for the pain she experiences in her hands and feet. *Id.* Blessent testified the medication helps, but she still experiences pain. *Id.* at 45. She further testified her pain interferes with daily activities, and she can hardly do anything for more than fifteen minutes. *Id.*

She was also prescribed antidepressant medications by three different physicians. *Id.* at 46. Blessent testified her depression makes her often feel sad and affects her ability to concentrate. *Id.* Blessent also testified she has anxiety attacks at least two or three times a week that last approximately five minutes. *Id.* at 46-47, 56. Any confrontation will trigger an anxiety attack. *Id.* at 56.

Blessent also testified that she has memory problems. *Id.* at 47. Some of her memory problems include not remembering to take her medications on time and forgetting doctor appointments; however, she has a phone application that reminds her of both items. *Id.* Blessent stated she also has symptoms of "chemo brain," which causes difficulties having conversations with individuals, because she cannot find the words. *Id.* at 48.

On a typical day, Blessent testified she wakes up around 10:00 or 11:00 a.m. and has cereal and coffee for breakfast. *Id.* Her husband might help her do laundry. *Id.* He will take the load of clothes downstairs. *Id.* Afterwards, she will put them in the washer and dryer. *Id.* Once the clothes dry, her husband brings them up the stairs. *Id.* She folds the laundry. *Id.* On days they do laundry,

Blessent testified she must take a nap in the afternoon, because she is so worn out from the activity. *Id.* Later in the day, she may also go to an Alcoholics Anonymous ("AA") meeting, followed by dinner, and goes to bed around midnight. *Id.* at 48-49.

Blessent testified she tries to clean the house, but is not very good at it, and cannot clean for too long. *Id.* at 49. She typically cleans in fifteen-minute intervals with breaks in between. *Id.* She also does not cook very often, and her husband goes grocery shopping with her to ensure she purchases everything on the list. *Id.* Blessent does not garden, mow, or do any yardwork. *Id.*

Blessent has a driver's license and drives approximately ten miles a week. *Id.* at 49-50. She drives to AA meetings three times a week. *Id.*

She testified that she owns a home computer and uses it for surfing the web, emailing, playing games, go pay, and banking. *Id.* at 50. Her husband began handling the finances after she started chemotherapy in March 2015, because she had overdrawn the account a few times. *Id.* at 55-56.

Her hobbies include crocheting, cross-stitching, and painting. *Id.* at 50. Blessent testified she could only partake in those activities in fifteen to twenty-minute intervals because her hands begin to hurt. *Id.* at 54. During breaks, she will typically go into another room and grab something to drink. *Id.* at 57. She also experiences loss of concentration and focus when crocheting and cross-stitching. *Id.* at 55. When this happens, she will go back and rip out the pattern to start over. *Id.*

Blessent stated that fellow individuals who attend AA meetings visit her, but she is not involved in any other organization. *Id.* at 50. She does not go to church. *Id.* at 51. She watches television for a few hours in the evening and occasionally reads novels. *Id.*

When Blessent underwent her double mastectomy, she would watch her granddaughter, but testified she could not pick her up or hold her, because her hands would hurt. *Id.* at 51, 54.

Blessent can bathe and dress herself, but showers are difficult, and she uses a shower seat. *Id.* at 52. She uses the seat because her feet hurt, and she experiences sharp pains if she stands on them for too long. *Id.* at 53. She testified that taking a shower wears her out and she often takes a break to lie down before she can dress herself. *Id.* at 52.

Blessent also testified that she smokes about a half a pack of cigarettes a day. *Id.* She stopped drinking on July 19, 2003. *Id.* She does not use any street drugs. *Id.*

She has problems with stairs, specifically, going down them. *Id.* at 56. When Blessent goes down the stairs she takes each step one at time; however, she does not have issues going up the stairs. *Id.*

**B.      Vocational Expert's Testimony**

The following discussion occurred between the ALJ and VE Wolford regarding the vocational hypothetical:

> Q: [. . .] And assume an individual born in 1965, a high school graduate who has also earned an Associate's [sic] degree in criminal justice. Assume further that the individual has past work such as you summarized. Assume further the individual is limited to lifting or carrying no more than 10 pounds frequently, 20 pounds occasionally; no climbing of ladders, ropes, scaffolds; only occasional stairs, ramps, stooping, crouching, crawling, or balancing. And because of some deficiencies in concentration and attention, she would not be able to carry out complex detailed instructions. Could such an individual do her past work?
>
> A: No, they could not.
>
> Q: All right. Are there other jobs such person could do?
>
> A: Yes.
>
> Q: Please cite examples.
>
> A: Final assembler. DOT code 713.687-018. SVP level 2. Physical capacity, sedentary. National numbers, 229,240. Charge account clerk. DOT code 205.367-014. SVP level 2. Physical capacity, sedentary. National numbers, 204,730. Document preparer. DOT code […] 249.587-019. SVP level 2. Physical capacity, sedentary. National numbers, 97,252.

Q: Okay. Would there be any jobs that exceed the demands of sedentary work such a person could do?

A: No, your honor.

Q: Okay. What in the assumed limitations would rule out virtually all light work?

A: The lifting restriction.

Q: Lifting was 10 pounds frequently, 20 pounds occasionally.

A: Oh, I had 10 pounds. I'm sorry.

Q: Okay […] So are there any jobs you could cite?

A: Yes. Absolutely.

Q: Okay.

A: Cleaner/housekeeping. DOT code 323.687-014. SVP level, 2. Physical capacity, light. National numbers, 371,379. Routing clerk. DOT code 222.687-022. SVP level 2. Physical capacity, light. National numbers, 74,788. Cafeteria attendant. DOT code 311.677-010. SVP level 2. Physical capacity, light. National numbers, 73,085.

Q: Okay. Now if we were to add a restriction to only occasional handling and fingering, would that change your answer?

A: Yes. None of those jobs would remain.

Q: Are there other jobs that could be cited?

A: No, your honor.

Q: Okay. The numbers you cite to these jobs for national figures, I take it in each instance these jobs would be distributed rather generally in the national economy in rough proportion to the population. Would that be accurate?

A: Yes.

*Id.* at 58-61. The following discussion occurred between VE Wolford and Blessent's attorney:

Q: Ms. Woolford [sic], can you tell me in your opinion what is the tolerance for absences from the jobs you cited?

A: First of all, the DOT does not address absenteeism, so it is based upon my experience. Typically employers can tolerate one to two absences in a given month. If, though, the individual is going to be absent two times or greater on a monthly consistent basis, then the individual would most likely not be able to maintain competitive level employment.

Q: And what is the tolerance for being off task in the jobs you cited?

A: That also is not addressed in the DOT. So this is based upon my experience. Typically employers can tolerate up to about 15 percent. If, though, the individual is going to be off task 15 percent or greater on a daily consistent basis, then the individual would have difficulty maintaining competitive level employment.

*Id.* at 61.

## II.    ALJ Rickert's Decision

The issue before ALJ Rickert was whether Blessent was disabled under sections 216(i) and 223(d) of the Social Security Act, as well as whether the insured status requirements of those sections were met. *Id.* at 13-14. Blessent's earnings record showed she acquired sufficient quarters of coverage to remain insured through December 31, 2016. Accordingly, Blessent had to establish disability on or before that date in order to be entitled to a period of disability benefits. *Id.* at 14.

The ALJ found through the date last insured, Blessent had experienced the following severe impairments: residuals from breast cancer and treatment, cervical degenerative disc disease, cardiomyopathy neuropathy, anxiety, and depression. 20 C.F.R. § 404.1520(c). *Id.* at 16. The ALJ found these severe impairments to significantly limit the ability of Blessent to perform basic work activities as required by SSRs 85-28 and 96-3p. *Id.* The ALJ noted that while Blessent had been diagnosed with trigger finger and DeQuervain's tenosynovitis, there was insufficient evidence in the record that these impairments were severe. *Id.* He further noted that although Blessent displayed significant deficits during her health examinations, such as, decreased strength, weakness, and positive clinical signs, there was significant evidence that her release surgery from September 2016 addressed these problems. *Id.*

The ALJ found that Blessent did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. *Id.* The ALJ concluded that listings 13.10 were not met because there was no evidence of: (1) locally advanced carcinoma; (b) carcinoma with metastases to the supraclavicular or infraclavicular nodes, to ten or more axillary nodes, or with distant metastases; (c) recurrent carcinoma; (d) small cell carcinoma, or secondary lymphedema. *Id.*

After considering both her testimony and written statements, the ALJ found in understanding, remembering, or applying information, Blessent had mild limitation. *Id.* Because she testified that she watches television and reads, the ALJ concluded she did not have problems following material or programming. *Id.*

The ALJ found in interacting with others, Blessent had mild limitation. While Blessent testified she has problems maintaining a conversation, she also noted that she goes to AA meetings three times a week. *Id.* Additionally, Blessent noted that she goes outside up to four times a week, shops at least once a week, socializes in person and online, and denied problems getting along with other people or any history of firings or layoffs related to interpersonal problems. *Id.* at 17.

Regarding concentrating, persisting, or maintaining pace, the ALJ found Blessent had moderate limitation. *Id.* The ALJ came to this conclusion after reviewing Blessent's testimony and written statements about reminders to take her medications and go to appointments. *Id.* Additionally, she alleged a variable ability to handle finances, but lost interest in everything except television and using the computer. *Id.* Blessent further noted she makes herself go to social activities and she typically finishes what she starts. *Id.*

As for adapting or managing oneself, the ALJ found that Blessent had mild limitation. *Id.* While Blessent noted problems with concentrating and focusing in completing daily activities, she also stated she had a variable ability to handle stress and changes in routine. *Id.*

In regard to Blessent's residual functional capacity ("RFC"), the ALJ found she was able to perform light work as defined in 20 C.F.R. § 404.1567(b), with the exception that she could not climb ladders, ropes, and scaffolds; could make only occasional use of stairs and ramps; and could occasionally stop, crouch, crawl, and balance. *Id.* Because of her deficiencies in concentration and attention, Blessent was limited to work involving no complex or detailed instructions. *Id.* The ALJ found while Blessent's medically determinable impairments could reasonably be expected to produce the alleged symptoms she claimed in her testimony and written statement, her symptoms were not entirely consistent with the evidence in the record. *Id.* at 19. The ALJ continued by summarizing the below medical records.

Although Blessent has endured an extensive range of specialty care, where she displayed significant deficits on both mental status and physical exams, the ALJ stated that there were multiple exams that were wholly normal. *Id.* In one record, Blessent stated she did not have panic attacks often, which contradicted her testimony, and that she wanted to be on "short term disability" until she could work. *Id.* Additionally, while she testified that watching her grandchild and crocheting and cross-stitching are difficult tasks, the ALJ noted Blessent's ability to engage in these hobbies was probative of a higher level of function than she alleged, including her allegations of pain almost every day. *Id.* Additionally, the ALJ discounted the seriousness of Blessent's shortness of breath given her significant history of daily cigarette smoking. *Id.*

The ALJ noted that Blessent had been diagnosed with breast cancer, neuropathy, anxiety, and depression. *Id.* In December 2014, after Blessent underwent her bilateral mastectomy, the

record indicated she did not report fatigue or shortness of breath. *Id.* Rather, she was "fully active" and "able to carry on all pre-disease performance without restriction." *Id.*

By February 2015, the ALJ stated Blessent's records indicated she had symptoms of depression, hair loss, migraine headaches, tiredness, and was "emotionally very devastated." *Id.* Blessent had the same symptoms in March 2015 and displayed only mild psychomotor retardation. *Id.* at 20. A physical exam from this time was normal and several exams from April were also normal. *Id.* However, in late April 2015, Blessent's exams showed bilateral pulmonary thromboemboli. *Id.* By May 2015, Blessent was diagnosed with cardiomyopathy, but future physical exams were normal. *Id.* Other notes from this time indicated that Blessent was "dealing well with stress." *Id.* June 2015 notes indicated "patient has no complaints" and was "hoping for short term disability until she can return to work." *Id.* In July 2015 and August 2015, notes indicated Blessent had neuropathy with numbness and tingling of the feet and fingers from her chemo, but a physical exam did not indicate problems with gate or range of motion, or any sensory abnormalities. *Id.* At an August 2015 consultative exam, Blessent's test results suggested "mild clinical depression;" however, Blessent asserted at the exam that panic attacks were not a problem. *Id.* Moreover, Blessent noted at the exam that several days prior she had attended an AA meeting with over twenty people, babysat her granddaughter for six hours, attended another AA meeting, played on Facebook, and then went to bed. *Id.* While Blessent presented with "multiple somatic" complaints in September 2015, such as, memory problems, tiredness, and restlessness, her physical exams were normal. *Id.* Later that month, Blessent was depressed, crying, and angry that her memory appeared to have "declined," but her judgment was not impaired. *Id.* Other records from this time indicated pain in the SI joint area and reduced range of motion in the lumbar spine. *Id.* In November 2015, records indicated Blessent's motor, muscle bulk, muscle strength, and gait were

all within normal limits and there was no evidence of redness or warmth in her arms or legs. *Id.* The ALJ notes the records also reflected that Blessent had a sensory deficit in her legs from feet to mid-calf and in her hands, but little additional detail was provided. *Id.* One December 2015 exam was normal, but another showed evidence of a slow and hesitant gait with bilateral hand and foot swelling, bilateral positive Tinel's testing, and reduced grip strength. *Id.*

In January 2016, Blessent underwent ketamine and lidocaine injections to address the numbness and pain in her arms and legs, but they offered little relief. *Id.* Imaging from this time also showed degenerative changes at C4-C5 and C5-C6, and a CT showed minimal chronic deep venous thrombosis in her legs. *Id.* at 21. Blessent had a slow gait at this time and swelling in her hands, but Tinel's testing was negative and she retained full range of motion. *Id.* By March 2016, Blessent had reduced flexion in her fingers and toes. *Id.* She also underwent replacement of one of her right breast implants and a prosthesis on the left at this time. *Id.* Some April 2016 records were positive of Blessent, claiming her speech and physical exams were normal; however, another record documented a reduced strength in both arms and her fingers as well as both her legs. *Id.* Despite this, she had a full range of motion of her wrists, ankles, and feet. *Id.* In May 2016, records indicated Blessent had reduced strength in her wrists, a positive Finkelstein testing, and was required to use a thumb brace. *Id.* Other notes indicated it was "unknown if patient was putting forth maximal effort with each strength test." *Id.* By August 2016, Blessent had edema in her feet and hand swelling bilaterally, but no acute distress or evidence of gait abnormality. *Id.* In September 2016, Blessent underwent DeQuervain's release surgery, and the next month, she had full range of motion in her hands and feet with no distress. *Id.* She indicated that she still had pain in her hands and feet, but "not as before." *Id.* In November 2016, her physical exam was normal.

*Id.* In December 2016, Blessent had a mental status exam which indicated she had impaired memory and a decrease in concentrating ability, but her visual attention was not impaired. *Id.*

The ALJ also noted Blessent was clinically obese because she was five feet and four inches and weighed 195 to 232 pounds. *Id.* The ALJ considered how Blessent's weight affected her ability to perform routine movement and necessary physical activity within the work environment, and concluded that in spite of her weight, Blessent ambulates well without an assistive device, and often retains functional, full, and pain free range of motion. *Id.* at 22.

The ALJ assigned significant weight to the opinions of state agency examiners who evaluated Blessent. *Id.* Their evaluation concluded Blessent was able to perform work at a light exertional level, with an ability to lift up to twenty pounds occasionally, ten pounds frequently, sit for six hours of an eight-hour workday, and stand and walk for six hours. *Id.* Additionally, Blessent was found able to perform posturals occasionally, with an unlimited ability to balance. *Id.* Regarding Blessent's mental capabilities, she was found to have mild restrictions in her ability to perform activities of daily living and social functioning, while she had a moderate restriction in concertation, persistence, and pace. *Id.* Accordingly, the state agency examiners concluded Blessent would be able to conduct light work involving simple tasks and decisions. *Id.*

The ALJ assigned little weight to Blessent's treating physician, Dr. Hwan Jeong. *Id.* Dr. Jeong provided a January 2016 letter indicating Blessent had developed "chemo brain," which made it difficult for her to concentrate. *Id.* The ALJ stated that he compared Dr. Jeong's previous notes to the letter and concluded there was little support for his conclusion in her exams. *Id.* The ALJ also noted that Dr. Jeong offered little explanation in support of his assertions in his short letter and provided no citations to objective evidence. *Id.*

Additionally, the ALJ assigned little weight to Blessent's treating psychologist, Dr. Phillip Foster. *Id.* at 23. Dr. Foster opined Blessent "may be prone to conflicts with authority figures, and she may have trouble relating to professionals in medical settings." *Id.* The ALJ concluded these opinions were vague and not couched in a "function-by-function format." *Id.* Moreover, while there were indications Blessent was angry at times, there was little evidence that Blessent required work in limited contact with other people. *Id.*

Furthermore, the ALJ assigned little weight to Blessent's other treating physician, Dr. Carmen Chase. *Id.* Dr. Chase indicated Blessent's medication and treatments had been ineffective. *Id.* She further noted Blessent's "chemo brain" made it difficult for her to learn a new job for gainful employment. *Id.* However, these findings were made more than five months after the expiration of Blessent's last date insured. *Id.*

The ALJ concluded that several of Blessent's physical and mental exams were normal, her subjective complaints were not fully reliable, and the only contrary medical source statements were short, lacked detail, and cited to no objective evidence. *Id.* Furthermore, he stated that based on the VE's testimony, and considering Blessent's age, education, work experience, and RFC, she could make a successful adjustment to other work that existed in significant numbers in the national economy. *Id.* at 25. Work such as cleaner/housekeeping, routing clerk, and cafeteria attendant would have been available. *Id.* at 24.

Therefore, the ALJ found Blessent was not disabled, as defined in the Social Security Act, at any time from November 19, 2014, the alleged onset date, through December 31, 2016, the date last insured. *Id.* at 25. 20 C.F.R. § 404.1520(g).

## STANDARD OF REVIEW

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's findings with the Court's own assessment of the evidence. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of his or her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform his or her past relevant work; and

5) is unable to perform any other work existing in significant numbers in the national economy.

An affirmative answer at any step leads either to the next step of the test, or at steps three and five, to a finding that the plaintiff is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point, other than at step three, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Id.* The plaintiff has the burdens of production and persuasion on steps one through four. *Id.* However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Id.*

## DISCUSSION

In her Motion for Summary Judgment, Blessent argues the ALJ failed to properly assess her treating oncologist Dr. Jeong's opinion, the ALJ's credibility assessment was patently wrong, and the ALJ performed an inadequate RFC assessment.

### I.   Dr. Jeong's Medical Opinion

"A treating [physician's] opinion is entitled to 'controlling weight' if it is adequately supported by objective medical evidence and consistent with other substantial evidence in the record. If the ALJ discounts the opinion of a claimant's treating physician, he must offer 'good reasons' for doing so." *Harlin v. Astrue*, 424 F. App'x. 564, 567 (7th Cir. 2011). "The agency's regulations shed some light on how [an ALJ] should approach the question of the weight to be given to a doctor's opinion. They state that more weight should be given to the opinions of doctors who have (1) examined a claimant, (2) treated a claimant frequently and for an extended period of

time, (3) specialized in treating the claimant's condition, (4) performed appropriate diagnostic tests on the claimant, and (5) offered opinions that are consistent with objective medical evidence and the record as a whole." *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013).

"[M]ore weight is generally given to the opinion of a treating physician because of his greater familiarly with the claimant's conditions and circumstances." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *see Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir. 1982). "A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(c)(2).[2]

Here, Blessent argues the ALJ failed to properly evaluate her treating oncologist Dr. Jeong's opinion regarding her "chemo brain." Dr. Jeong's opinion, dated January 20, 2016, stated:

> I have treated Mrs. Mary Blessent for caner [sic] with series of chemotherapy. As side effects of this treatment, she has developed memory problems called "chemo brain" that makes her very difficult to concentrate an [sic] focus. In my opinion, these problems will interfere [with] her ability to stay on the task during eight hours a day and reduce her productivity to less than 80%.

(ECF No. 12 at 8). Blessent states that Dr. Jeong's opinion warrants controlling weight, because Dr. Jeong had a significant treatment history with Blessent, his opinion is consistent with the record, and as an oncologist, he specialized in treating cancer. The ALJ's decision to assign it little weight, Blessent argues, was legally insufficient and not supported by substantial evidence.

The Commissioner maintains that the ALJ did not err in evaluating Dr. Jeong's opinion, because Dr. Jeong did not opine that Blessent was functionally limited by her symptoms of neuropathy, shortness of breath, and fatigue.

---

[2] The treating physician rule found in 20 C.F.R. § 404.1527 has since been eliminated by the Social Security Administration. However, the rules in § 404.1527 apply to claims filed before March 27, 2017. Here, Blessent's claim was filed on January 26, 2015.

When considering Dr. Jeong's opinion and Blessent's limited ability to be productive, the ALJ found "[a] comparison of [Dr. Jeong's] opinions and … notes show little support for these findings in the exams of the claimant." Tr. at 22. The ALJ further noted that Dr. Jeong "offers little explanation in support of these assertions in his short letter and provides no citations to objective evidence nor does he marshal objective evidence to support them." *Id.* These two sentences are the only explanations provided by the ALJ to support his decision to assign little weight to Blessent's treating physician's letter. Instead, the ALJ gave significant weight to the opinions of non-examining state evaluators.

The Court finds the ALJ erroneously discounted the opinion of Blessent's treating oncologist, whose opinion should have been given controlling weight. The only medical evidence given any significant weight were reports from state evaluators, but under the regulations, opinions from these sources are given the least amount of weight. *See* 20 C.F.R. § 404.1527(c)(3) and § 416.927(c)(1)-(2). The significant weight placed on the non-examining sources was inappropriate. Section 404.1527(c)(2) states that if the ALJ finds "a treating source's medical opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

In this matter, Dr. Jeong both examined and treated Blessent for a comprehensive period of time, including her initial consultation on September 26, 2014, through November 15, 2016, which is right before the date last insured. Tr. at 322, 853. The nature of Dr. Jeong's treatment over this time was extensive and included ordering imaging and regular blood work, along with prescribing Blessent chemotherapy, migraine medication, Xarelto for her pulmonary embolism,

and medications for neuropathy of the feet and fingers from her Taxol chemotherapy. *Id.* at 314-327, 431-490, 511-514, 526-535, 543-565, 646-716, 853-866. In fact, the Commissioner notes in his Motion for Summary Affirmance that "Plaintiff consistently saw her oncologist, Dr. Jeong." (ECF No. 16-1 at 3). Accordingly, the ALJ should have given Dr Jeong's opinion more deference.

Additionally, Dr. Jeong's opinion is supported by opinions from other providers. For example, treatment notes from Advocate Medical Group indicated that Blessent was diagnosed with neuropathy of lower extremities and her hands, along with depression and anxiety. *Id.* at 733. Doctors at Advocate Medical Group treated her consistently for anxiety, depression, and chemotherapeutic-induced neurotherapy. *Id.* at 734, 737, 741, 747, 751. One note stated that "[d]ue to [Blessent's] chemotherapy she has experienced impaired memory and has felt it has debilitated her..." *Id.* at 742. Dr. Taimoorazy, who was treating Blessent for pain in her hands, feet, and neck, also noted she had neuropathy after chemotherapy. Tr. at 613. This diagnosis was included on many visit notes. *Id.* at 599, 601, 603, 605, 607, 609. Dr. Jeong's own notes also support his opinion. *Id.* at 543, 545, 547, 549, 556, 562, 564, 649, 651, 663, 665, 668, 670, 672, 674, 676, 678, 680, 682, 684, 686, 691, 693, 697, 703, 707, 711, 713, 853, 855, 859, 861, 863, 865.

Substantial evidence does not support the ALJ's conclusion that Blessent's symptoms were inconsistent with her medical records. The Commissioner argues Blessent's exams were overwhelmingly normal following her mastectomy. While there were certainly some positive reports of Blessent's recovery, overall, most reports included numerous complaints of memory dysfunctions and continual diagnoses of migraine headaches, pulmonary embolism, dizzy spells, and neuropathy from chemotherapy. *Id.* at 545, 549, 556, 564, 651, 655, 665, 670, 674, 678, 682, 686, 693, 697, 699, 700, 703, 707, 713, 855, 861, 865.

Here, the ALJ summarily concluded that Dr. Jeong's opinion was inconsistent with the evidence of record; however, the ALJ did not identify evidence that was inconsistent with Dr. Jeong's opinion when concluding it was entitled to little weight. Even if Dr. Jeong's opinion was not entitled to controlling weight under the treating physician rule, treating source medical opinions are still entitled to deference and must be weighed using all the factors provided in 20 C.F.R. § 404.1527. The ALJ did not demonstrate she weighed Dr. Jeong's opinion under any of the factors.

The Seventh Circuit has remanded a case where "[t]he ALJ's decision indicate[d] that [he] considered opinion evidence in accordance with [the regulations]," but did not "explicitly address the checklist of factors as applied to the medical opinion evidence." *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Therefore, the Court recommends the ALJ be directed to consider the evaluations performed by Dr. Jeong upon remand and either reconsider Plaintiff's claim in light of her doctor's findings or provide good reason for rejecting his opinion.

## II.    The ALJ's credibility assessment

An ALJ's credibility determination should be reversed only if it is patently wrong. *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). However, an ALJ's decision may be reversed if the ALJ "fail[s] to adequately explain his or her credibility finding by discussing specific reasons supported by the record." *Id.; Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (a credibility finding "must be specific enough to enable the claimant and a reviewing body to understand the reasoning").

### A.    The ALJ Playing Doctor

Blessent argues the ALJ played doctor when he drew an inference that her shortness of breath was due to her daily cigarette smoking and not her pulmonary embolism. The Commissioner

states any error the ALJ may have performed was harmless because the medical records demonstrate her shortness of breath was addressed, and the ALJ provided several other reasons discounting Blessent's reports as to her limitations.

In his decision, the ALJ stated the following:

> The undersigned cannot help but discount the seriousness of the claimant's limitations in this regard, given her significant history of daily cigarette smoking. While the claimant attempted to quit or cut back at times, which is commendable, the claimant's significant history of smoking is not consistent with that of a person who believes her disability is, even in part, due to shortness of breath. In this regard, the undersigned takes judicial notice of the massive body of medical opinion regarding the deleterious effects of cigarette smoking.

Tr. at 19. These explanations are not adequate.

In *Rousey v. Heckler*, 771 F.2d 1065 (7th Cir. 1985), the plaintiff smoked a half a pack of cigarettes a day and had COPD. The Seventh Circuit held it was "improper for the ALJ to make his own determination regarding the prognosis of recovery should [plaintiff] stop smoking, when the record was devoid of any evidence that she could return to work if she quit smoking." *Id.* at 1069. It also found no doctor submitted evidence stating "[plaintiff] would be restored to a non-severe condition if she quit smoking her half-pack of cigarettes." *Id.* The Seventh Circuit rejected the government's argument that the effect of smoking on [plaintiff's] COPD was "well documented" and thus essentially self-proving. *Id.* The ALJ still must point to "testimony and medical evidence in the record" to support the conclusion. *Id.* Additionally, the Seventh Circuit noted none of the medical evidence "linked her chest pain directly to the smoking of cigarettes" and therefore it was not proper for the ALJ "to independently construct that link." *Id.* at 1070.

Similar to the scenario in *Rousey*, the ALJ assumed Blessent's shortness of breath was a result of her daily cigarette smoking. However, the medical records are clear that Blessent was diagnosed with pulmonary embolism following a CT on April 24, 2015. Tr. at 451-452. Several

of Dr. Jeong's treatment notes also stated Blessent had pulmonary embolism and he prescribed her Xeralto for it. *Id.* at 432, 433, 441, 442, 445, 446, 448, 449. By June 12, 2015, Blessent was noted as feeling better with Xarelto, *Id.* at 511, and further treatment notes stated Blessent was showing clinical improvement. *Id.* at 528. However, treatment notes from Dr. Jeong and other doctors indicated that she continued Xarelto due to continued pulmonary embolism issues despite showing improvement. *Id.* at 527, 528, 533, 534, 544, 545, 548, 549, 563, 564, 574, 579, 583, 598, 650, 651, 758. Additionally, while Blessent stated she tried to quit smoking, one of her treating physicians, Dr. Kettering, noted she would need to focus on treating her depression and anxiety before she would be able to quit smoking. *Id.* at 581; *see Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000) (citing to *Rousey* and stating that "it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies that the condition is serious or painful"). As in *Rousey,* the record does not indicate that Blessent could return to work if she quit smoking or that she would be restored to a non-severe condition if she quit smoking.

In its response, the Commissioner asserts that the ALJ provided "a number of other reasons for discounting Plaintiff's reports as to her limitations;" however, that is not accurate. (ECF No. 16-1 at 10). The ALJ's conclusion does not assert a number of reasons why Blessent's reports of shortness of breath should be undermined. Instead, it simply states that she has a history of smoking and there is a "massive body of medical opinion" regarding the effects of smoking. Tr. at 19.

The ALJ needs to substantiate his finding with evidence from the record on this issue. Therefore, the Court recommends that the ALJ properly address Blessent's shortness of breath as it relates to her diagnosis of pulmonary embolism on remand.

### B. Blessent's Credibility due to Reported Activities of Daily Living

Blessent also argues the ALJ's credibility determination was patently wrong because he discounted her credibility due to reported activities of daily living. Blessent states the ALJ failed to account for her treatment notes which included reports of her issues. The Commissioner argues the ALJ did not equate Blessent's activities with full-time work, and it was not an error for him to suggest she was more capable of physical activity than alleged.

In his decision, the ALJ stated:

> A review of the claimant's activities of daily living show that she continues to be active in going to AA meetings and serving in a leadership role. She also noted she drives, watches her grandchild, and engages in crocheting and cross stitching. While the claimant noted at hearing that the latter two can be very difficult for her – the fact that she can engage in these hobbies at all is probative of a higher level of function than alleged at other points - particularly her allegations of pain almost every day.

Looking to ability to perform daily activities as solid proof that Blessent is not disabled is a tactic that has been repeatedly criticized by the Seventh Circuit. ALJs should be careful about placing too much weight on the ability to do daily activities. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Specifically, unlike with work activities, a claimant often can perform household activities under a more flexible standard and, moreover, these activities are typically judged by a lower standard of performance. *Id.* The "failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Id.; Hamilton v. Colvin*, 525 F. App'x. 433, 438 (7th Cir. 2013) ("We have admonished ALJs to appreciate that, unlike full-time work, the 'activities of daily living' can be flexibly scheduled"). This is not to say that daily activities should not be considered at all. While it is appropriate to consider such activities in a credibility determination, it should be done "with

care," and acknowledging that an ability to perform daily tasks with some limitations "does not necessarily translate into an ability to work full-time." *Roddy*, 705 F.3d at 639.

Here, the ALJ has not considered Blessent's daily activities with care. The ALJ points out that Blessent can drive, attend AA meetings, watch her grandchild, and crochet and cross-stitch. However, he does not acknowledge that Blessent would conduct these activities in fifteen-minute intervals due to her pain, and on other occasions, nap or lie-down because she would be worn out by then. Tr. at 48-50, 52-54. Blessent also testified she was on several medications for the pain she experiences in her hands and feet, and her medical records confirm that testimony. *Id.* at 45. As the Seventh Circuit has noted, "one can have awful [pain] and still dress and bathe." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Put simply, there are many situations in which a plaintiff may have serious pain, but still perform daily chores. *See Hughes v. Astrue,* 705 F.3d 276, 279 (7th Cir. 2013). The Court does not suggest that is the case here, but rather, the ALJ should have given a more nuanced and thorough discussion of Blessent's daily activities. Instead, the ALJ summarily concluded that her activities are inconsistent with the severe pain she complains about, mainly of the hands and feet. Therefore, the Court finds that a remand is required based on this issue.

### III.    The ALJ's RFC assessment

Blessent states the ALJ erred by finding she had the RFC to perform light work, because she would be required to stand or walk for about six hours in an eight-hour workday, which directly contravenes her limitations resulting from her chemotherapeutic-induced neuropathy. The Commissioner argues that while the ALJ acknowledged Plaintiff's impairments would cause functional limitations, her testimony that she could only perform activities for fifteen minutes at a time was inconsistent with her medical records.

In his decision, the ALJ stated:

> The claimant's pain, fatigue, reduced ranges of motion, weakness, numbness, tingling, and the complicating effect of her body habitus limit her to light work. These signs and symptoms further indicate [she] cannot climb ladders, ropes and scaffolds, can make only occasional use of stairs and ramps and engage in only occasional stooping, crouching, crawling, and balancing. Her attention focus, concentration, persistence and pace problems along with the distracting impact of her pain and numbness limit her to work involving no complex or detailed instruction.

Tr. at 22.

However, because of the pain Blessent was experiencing from her neuropathy, she testified she was only able to accomplish tasks within fifteen-minute intervals, often having to pause or nap afterwards. *Id.* at 48-50, 52-54. Treatment notes in Blessent's medical record also confirm she made similar complaints to her treating physicians. *Id.* at 684, 730, 738, 747.

Blessent's medical record shows that Dr. Jeong diagnosed Blessent with neuropathy of the feet and fingers on or about August 6, 2015, and prescribed her medications for it. Tr. at 528. A few months later, he referred her to Guardian Headache to evaluate her neuropathy where she was seen by Dr. Chioni and Dr. Taimoorazy. *Id.* at 596. In a letter dated December 17, 2015, from Dr. Chioni to Dr. Jeong, it was noted that Blessent had "loss of sensory sensation bilaterally in the lower extremities, almost to mid-calf, and in the hands, stopping mid-wrist." *Id.* at 667. Dr. Chioni recommended increasing her medication to see if it would alleviate the pain. *Id.* Blessent was seen at Guardian Headache for her neuropathy on several occasions in 2015 and 2016. By April 4, 2016, Dr. Taimoorazy stated Blessent was still complaining of pain, continued to have neuropathy of the upper and lower extremities after chemotherapy, and had failed certain medications. *Id.* at 598-599. On November 15, 2016, Blessent saw Dr. Jeong and was still complaining of severe neuropathy, and therefore, he continued to prescribe her pain medications. *Id.* at 853.

Additionally, the ALJ noted the medications Blessent was taking for her pain in this exchange:

Q: […] Gee, you take a lot of your medications at midnight, huh?

A: Yes, sir.

Q: All right. The hydrocodone, huh, you've been taking that ever since 2014?

A: I'm not sure when they added it. I think it was more like a year ago, I think. I think I've been on it a year.

Q: Okay. Okay. [INAUDIBLE]. Again, you continue to experience pain. Obviously it explains why you're taking hydrocodone. Where do you experience the pain?

A: My hands and my feet.

*Id.* at 44. Blessent's doctors believed she was in pain as they continued to prescribe her medication between 2014, and at least up until the hearing date in 2017. *See Scrogham v. Colvin,* 765 F.3d 685, 701 (7th Cir. 2014) (finding that treating physicians who continue to prescribe drugs indicates they believed complaints of pain).

Additionally, Blessent argues the ALJ committed harmful legal error by failing to question the VE regarding the impact her daily naps, headaches, and fifteen-minute breaks would have on employment. She states that when the VE identified the jobs available, the ALJ failed to question how Blessent could, for example, clean for fifteen minutes, and then take a break before she could return to cleaning. The Commissioner did not address this argument in his response.

Though the ALJ is not required to mention every piece of evidence, he must build a logical bridge between the evidence related to Blessent's limitations and his conclusion that Blessent could perform light work that required standing or walking continuously for approximately six hours. *See Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Without mentioning Blessent's prescribed limitations, including the need to take breaks approximately every fifteen minutes and

nap after tasks, the ALJ failed to build a logical bridge. Similarly, the ALJ did not address the VE's testimony where he stated if an individual was going to be off task fifteen percent or more daily, then that individual would have difficulty maintaining competitive level employment. Tr. at 61.

An ALJ cannot disregard significant conflicting evidence when making his residual functional capacity determination. *Clifford,* 227 F.3d at 873–74. On remand, the ALJ should discuss Blessent's prescribed limitations and how they may affect light work, as well as, whether a VE would consider these limitations to hinder employment.

## CONCLUSION

For the reasons set forth above, Blessent's Motion for Summary Judgment [11] is GRANTED and the Commissioner's Motion for Summary Affirmance [16] is DENIED. This matter is REVERSED and REMANDED to the ALJ for further proceedings consistent with this Order and under sentence four of 42 U.S.C. § 405(g). This case is now TERMINATED.

ENTERED this 9th day of December, 2019.

                                               \_\_\_\_\_/s/ Michael M. Mihm\_\_\_\_\_
                                                 Michael M. Mihm
                                          United States District Judge